## Miller *versus* Kirkpatrick.

The salary of a minister of the gospel, employed and paid by an unincorporated religious society, is liable to be assessed and taxed under the 32d section of the Act of 29th April, 1834, imposing a tax on "all offices, posts of profit, professions, trades, and occupations."

The term "profession" designates the calling of a minister of the gospel with sufficient certainty; and is especially applicable to persons who practise or teach in law, physic, or divinity.

The exception in the statute in favour of "farmers" excludes all other exceptions.

ERROR to the Common Pleas of *Westmoreland county.*

This was an action of trespass *de bonis asportatis*, originally brought by Rev. David Kirkpatrick against Moses Miller, and removed into the Common Pleas by appeal, where on the trial the jury found the following special verdict:—

"It is admitted that the plaintiff is a clergyman or minister of the gospel of a congregation not incorporated.   That, as such, he was assessed for a state and county tax at the valuation of $400 per annum for his calling, occupation, or profession, as such minister of the gospel.   That the tax thus assessed upon him was sought to be collected; and for that purpose the amount was put into the collector's duplicate, and the plaintiff neglecting and refusing to pay the same, the defendant in this case, being the collector of tax regularly appointed as such, levied upon the property of the plaintiff to raise by the sale thereof the amount of said tax.   This suit was then brought to recover damages for the trespass alleged to be committed in making the levy for the tax thus in arrear.

"It is also admitted that all the taxes assessed on the plaintiff were paid except that assessed for his said calling as a minister, and that the defendant had notice of that fact.   It is, therefore, agreed that, if the plaintiff was liable to be assessed for his said occupation or calling as a minister of the gospel, the verdict is to

[Miller *v.* Kirkpatrick.]

be for the defendant; but if not so liable, then the verdict is to be for the plaintiff for such damages as the jury may deem proper.

"The jury, therefore, find the foregoing admissions to be the facts in this case, and that the damages sustained by the plaintiff amount to the sum of $5; but whether the facts thus agreed upon and found by the jury entitle the plaintiff in law to recover, the jury are unadvised, and pray the judgment of the court."

The court entered judgment upon the verdict for the plaintiff. This was the error here assigned.

*Cowan*, for plaintiff in error.—Can a minister be taxed? Does his calling come within the Act of 29th April, 1844, which imposes a tax on "professions, trades, and occupations?" A contract is made between a congregation and a teacher of the same religious belief—he to instruct them at stated times, they to pay him a specified salary. Has he then such a trade, profession, or occupation as the law contemplates shall be the subject of taxation? It cannot be doubted that his calling comes within the definition of profession. Dr. Johnson says, "the term is particularly used of divinity, physic, and law." So the word occupation might well be held to include it. This being the uniform meaning of the word, it is to be taken in its usual sense when it refers to an object of taxation: Deitz *v.* Bayard, 2 *Watts* 172; Spangler *v.* York County, 1 *Harris* 326. No interest is to be relieved from the general burden unless the exemption is clearly expressed: Academy of Fine Arts *v.* Philadelphia County, 10 *Harris* 496. If the terms are broad enough to embrace ministers, they must be taxed, for there appears no intention to exempt them. The only exception being that of farmers, "*expressio unius est exclusio alterius.*"

The same intention appears in the Act of 1838, exempting churches, and the grounds not exceeding five acres.

A review of the Acts of Assembly on this subject will show how these terms were understood by the legislature. In the 8th sect., Act 11th April, 1799, a tax is imposed on "all offices and posts of profit, *trades and occupations, ministers of the gospel* of every denomination, and schoolmasters, only excepted." This exemption was repealed by the Act 3d February, 1817. In the revised Act 15th April, 1834, the word "professions" was added to "trades and occupations," and that collocation remains to the present time. If it were necessary in 1799 to *expressly* exempt ministers, why should not the same exist in 1844? Would any court have said they were exempt in the face of the Act of 1817?

The case of Cuyler and Agnew, 5 *W. & S.* 275, is said to decide that the exemption is *implied* in the law. The question was not there whether their *profession* could be taxed, but whether the

[Miller *v.* Kirkpatrick.]

*salary* could be rated. The authority of the case is destroyed by Union County *v.* James, 9 *Harris* 525.

But is such an exemption constitutional? This is compelling all in an indirect manner to contribute to the support of the churches and systems of religion, which is against the spirit if not the letter of the 3d sect., art. 9th of the Constitution. He also referred to 2 *Watts* 172; 1 *Harris* 326; 10 *Id.* 496.

*Armstrong*, for defendant in error.—In the Commonwealth *v.* Cuyler, 5 *W. & S.* 275, the question here raised was directly presented to this court, on the broadest grounds, and unanimously decided against the tax now claimed. If that decision is to stand there is an end of the question, for it is directly in point. But we take the ground that the "office of a minister of the gospel" is not within the letter, the reason, or the spirit of the law. It is not a "*profession.*" It is admitted that the body of the ministers constitutes one of the *learned professions;* but, in common parlance, we never speak of them as *professors.* They are designated as bishops, ministers, pastors, or priests, but never as professors. Webster defines the term "professor" to be one who publicly teaches any science or branch of learning, particularly "an officer in a university, college, or other seminary, whose business it is to read lectures, or instruct students in a particular branch of learning." The same author defines "pastor" to be "a minister of the gospel, who has the charge of a church and congregation." The terms are so used by all the best writers, as Swift, Milton, Addison, Hooker, Tooke, &c. Thus we find that the titles bishop, minister, &c., are synonymous; but none of them synonymous with the term "*professor.*"

But the learned counsel contends, that if not embraced within the word *profession* it is included in that of "*occupation.*" In this we join issue, and contend that the office of a minister is neither a "profession, trade, or occupation" within the purview of the statute. The legislature cannot constitutionally exercise any control over the office of a minister: Commonwealth *v.* Cuyler, 5 *W. & S.* 275.

The functions pertaining to the office are not of a civil or secular nature, and are for the most part exercised on the Sabbath, and yet they are exempted from the operation of the penal statute against the performance of secular labour upon that day. The office is by divine appointment, and owes no *tribute* or *allegiance* to any earthly potentate or state whatever.

A fundamental principle of the constitution is a total and entire separation of church and state, and the right of worship according to the dictates of each man's conscience. This is so entire, that each denomination has its own forms of government independent of the rights of visitation from the civil government. If the

[Miller *v.* Kirkpatrick.]

state have the right to tax the salary of an individual pastor, it may also do the same with the revenues of the church. Such has not been the policy or the law heretofore. The mind of the legislature, as gathered from all the statutes on the subject, indicates a disposition to aid and foster religion. The Act 16th April, 1838, § 29, exempts all churches, or places of worship, with the grounds, and the Act of 1839 limits it to five acres and the improvements. And in the Act 22d April, 1846, passed shortly after the decision in Commonwealth *v.* Cuyler, the legislature introduces this emphatic proviso, " *excepting always such property as shall be held in trust for religious purposes.*"

The opinion of the court was delivered by

LEWIS, C. J.—The question raised in this case is, whether a minister of the gospel, employed and paid by an unincorporated religious society, is liable to taxation for his " occupation" or " profession." The 32d section of the Act of 29th April, 1844, declares that " all offices, posts of profit, professions, trades, and occupations, except the occupation of farmers," " shall be valued and assessed, and subject to taxation." The term " profession" designates the calling of a minister of the gospel with sufficient precision. That term is especially applicable to persons who teach or practise in law, physic, or divinity. It is universally understood that ministers of the gospel are members of a learned profession. If this were not so, there is no difficulty whatever in classifying their calling under the head of " occupations." The clause, describing these objects of taxation, is sufficiently general in its language to embrace clergymen, who live by their professions, or derive a profit from them. The exception in favour of " farmers," excludes all other exceptions. If the legislature had intended to except the occupation of a clergyman from taxation, they would have said so when they were making an exception in favour of the occupation of farmers. This construction is also enforced by the principle which controls in regard to the imposition of public burthens. All men who receive the advantages of government are bound to contribute to its support, and therefore the rule is established that " none can claim exemption unless the exemption be so clearly expressed in the statute as to admit of no other construction:" 10 *Harris* 496.

The arguments urged against this assessment are, that a minister of the gospel exercises an " office," and not a " profession"— that the emoluments of his office are " gifts of the altar"— " spiritualities," too sacred to be taxed by the government—that his office is held " by divine appointment of God himself, and he therefore owes no tribute or allegiance to the state ;" and that a law imposing a tax on his occupation would tend to a union of church and state, and would be unconstitutional.

[Miller *v.* Kirkpatrick.]

It was decided in Commonwealth *v.* Cuyler, 5 *W. & S.* 375, that a minister of an *incorporated* religious society, is not an *officer* whose *salary* is liable to taxation.    Conceding that he may be, in some senses, an officer, it is plain that he is not an officer within the meaning of the law regulating taxation.    If he were, his case would be worse instead of better, for the salaries of offi- cers are taxed two per cent. on all sums over $200, while " occu- pations" and "professions" are taxed only one per cent. on their value.    It is not our province to decide whether persons learned in theology may regard the emoluments of a minister's calling as " gifts of the altar—as spiritualities."    The question here is, how are they to be regarded in a court of law, when the government demands of them a contribution to pay the debt and expenses of the state.    The money paid to a minister for his services, and designed for his personal benefit, is very far from being a mere " *spirituality.*"    It is designed to supply his *temporal* wants. It is appropriated to that object alone.    His services to the con- gregation may indeed be *spiritual;* but he would not be able to live long if his compensation were of the same character.    For- tunately for him it is not so; but is paid in a currency as tangible and purely temporal as the wants it provides for.    He may hold his " appointment of God."    " All power is of God."    " The powers that be are ordained of God," and he has " no right to resist their ordinances," or to refuse " tribute," or to renounce " allegiance to the state."    It is his duty as a Christian " to be subject not only for wrath, but for conscience' sake," and to pay " tribute to whom tribute is due, custom to whom custom."    The Saviour came into the world, at the very period when his earthly parents, at great inconvenience to themselves, were setting an example of allegiance to the government, and of obedience to its revenue laws.    His precepts afterwards were always in accord- ance with that example.    And the law, resting upon the founda- tion of that Christian morality which requires all who receive protection from government to contribute a just share to its support, will enforce its claims.

There is a difference between the minister's occupation and the church building.    The building neither yields, nor was designed to yield, any pecuniary profit for individual benefit.    The occu- pation of the minister yields a profit for his own private use. This may be the reason why the legislature have taxed the latter and not the former.    We do not see how a law which makes no distinction between ecclesiastical occupations and other pursuits, but taxes all alike, can tend to a union of church and state.    To hold that a minister of the gospel cannot be taxed at all, lest religious rivalry might lead to the abuse of that power, would furnish a precedent for denying all power of taxation; for there is no power which might not be abused by bad men.    We must

[Miller *v.* Kirkpatrick.]

trust to the intelligence of the people to guard against this evil. So far from seeing any constitutional objection to the imposition of taxes upon clergymen, as well as upon other professions, it has been seriously questioned whether they can constitutionally be exempted from their share of the public taxes. The constitution declares that "no man can of right be compelled to support any place of worship, or to maintain any ministry against his consent." A numerous class of our citizens still hold to the faith of the founders of this Commonwealth, and bear their testimony against what they call a "hireling ministry." Many others read their Bibles in their own way, disclaiming all connexion with religious congregations. If these classes of citizens should be compelled to pay more than their just proportion of taxes, in order that ministers of the gospel might be exempt, it is substantially the same thing as collecting the excess of taxes and paying it to the ministers to aid in maintaining them. Such a partial rule of taxation compels the Protestant to aid in maintaining the ministry of the Roman Catholic, constrains both to aid in supporting the Jewish priesthood; forces each to support a form of religion which his conscience rejects, and compels the opponents of all to aid in supporting all. These suggestions may serve to show that the claim to constitutional exemption is not only rejected, but met by a counter claim, which may deserve consideration when the question arises. At present it is sufficient to say that the Act of Assembly does not exempt the "profession" of a clergyman from taxation.

The Commonwealth *v.* Cuyler, 5 *W. & S.* 275, does not touch the present question. The question there was under the Act of 30th April, 1841. Here it is under the Act of 29th April, 1844. There the question was, whether a minister of an *incorporated* religious society was an "officer." Here it is, whether such employment by an *unincorporated* religious society is an "occupation or profession." There it was whether his *salary* could be taxed *two* per cent. Here it is whether the value of his calling shall be taxed *one* per cent. The questions are essentially different, and that case does not rule this. The argument of the judge who ruled the case of Commonwealth *v.* Cuyler, is not to be extended beyond the case before him. The views expressed by Judge LOWRIE in Union County *v.* James, 9 *Harris* 525, are more in accordance with sound policy and the true construction of the statute.

> Judgment reversed, and judgment for the plaintiff in error on the verdict.

WOODWARD, J., dissented.